# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

--------------------------------------------------------------- x

ALTAIR GLOBAL CREDIT OPPORTUNITIES )
FUND (A), L.L.C., CLAREN ROAD CREDIT )
MASTER FUND, LTD., CLAREN ROAD CREDIT )
OPPORTUNITIES MASTER FUND, LTD., )       Case No. 16-cv-_____
GLENDON OPPORTUNITIES FUND, L.P., )
NOKOTA CAPITAL MASTER FUND, L.P., )
OAKTREE-FORREST MULTI-STRATEGY, L.L.C. )
(SERIES B), OAKTREE OPPORTUNITIES FUND )
IX, L.P., OAKTREE OPPORTUNITIES FUND IX )
(PARALLEL 2), L.P., OAKTREE VALUE )
OPPORTUNITIES FUND, L.P., OCHER ROSE, )
L.L.C., PUERTO RICO AAA PORTFOLIO BOND )
FUND, INC., PUERTO RICO AAA PORTFOLIO )
BOND FUND II, INC., PUERTO RICO AAA )
PORTFOLIO TARGET MATURITY FUND, INC., )
PUERTO RICO FIXED INCOME FUND, INC., )
PUERTO RICO FIXED INCOME FUND II, INC., )
PUERTO RICO FIXED INCOME FUND III, INC., )
PUERTO RICO FIXED INCOME FUND IV, INC., )
PUERTO RICO FIXED INCOME FUND V, INC., )
PUERTO RICO GNMA & U.S. GOVERNMENT )
TARGET MATURITY FUND, INC., PUERTO RICO )
INVESTORS BOND FUND I, PUERTO RICO )
INVESTORS TAX-FREE FUND, INC., PUERTO )
RICO INVESTORS TAX-FREE FUND II, INC., )
PUERTO RICO INVESTORS TAX-FREE FUND III, )
INC., PUERTO RICO INVESTORS TAX-FREE )
FUND IV, INC., PUERTO RICO INVESTORS TAX- )
FREE FUND V, INC., PUERTO RICO INVESTORS )
TAX-FREE FUND VI, INC., PUERTO RICO )
MORTGAGE-BACKED & U.S. GOVERNMENT )
SECURITIES FUND, INC., SV CREDIT, L.P., TAX- )
FREE PUERTO RICO FUND, INC., TAX-FREE )
PUERTO RICO FUND II, INC., TAX-FREE )
PUERTO RICO TARGET MATURITY FUND, INC., )
and UBS IRA SELECT GROWTH & INCOME )
PUERTO RICO FUND, )
)
                    Movants, )
)
                  -against- )

GOVERNOR ALEJANDRO GARCÍA PADILLA in  )
his official capacity as the Governor of the        )
Commonwealth of Puerto Rico, JUAN ZARAGOZA- )
GÓMEZ in his official capacity as the Secretary of  )
Treasury of the Commonwealth of Puerto Rico, LUIS )
F. CRUZ BATISTA in his official capacity as the     )
Director of the Commonwealth's Office of            )
Management and Budget, and THE EMPLOYEES            )
RETIREMENT SYSTEM OF THE GOVERNMENT             )
OF THE COMMONWEALTH OF PUERTO RICO,            )
                                                    )
            Respondents.                            )
---------------------------------------------------------------- X

## MOTION OF CERTAIN SECURED CREDITORS OF THE
## EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT
## OF THE COMMONWEALTH OF PUERTO RICO
## FOR RELIEF FROM THE PROMESA AUTOMATIC STAY

**TO THE HONORABLE COURT:**

Movants Altair Global Credit Opportunities Fund (A), LLC, Claren Road Credit Master

Fund, Ltd., Claren Road Credit Opportunities Master Fund, Ltd., Glendon Opportunities Fund,

L.P., Nokota Capital Master Fund, L.P., Oaktree-Forrest Multi-Strategy, LLC (Series B),

Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel 2), L.P., Oaktree

Value Opportunities Fund, L.P., Ocher Rose, L.L.C., Puerto Rico AAA Portfolio Bond Fund,

Inc., Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Target Maturity

Fund, Inc., Puerto Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund II, Inc., Puerto

Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed

Income Fund V, Inc., Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc.,

Puerto Rico Investors Bond Fund I, Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico

Investors Tax-Free Fund II, Inc., Puerto Rico Investors Tax-Free Fund III, Inc., Puerto Rico

Investors Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V, Inc., Puerto Rico

Investors Tax-Free Fund VI, Inc., Puerto Rico Mortgage-Backed & U.S. Government Securities

Fund, Inc., SV Credit, L.P., Tax-Free Puerto Rico Fund, Inc., Tax-Free Puerto Rico Fund II, Inc., Tax-Free Puerto Rico Target Maturity Fund, Inc., and UBS IRA Select Growth & Income Puerto Rico Fund (collectively, "Movants"), by and through their attorneys, respectfully move for relief from the automatic stay imposed pursuant to Section 405 of the Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. 114-187 ("PROMESA"), unless adequate protection is granted in the form of placing the employer contributions collected during the automatic stay in an account established for the benefit of Movants.[1]   Movants are holders of secured bonds issued by the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "ERS").   In support of the Motion, Movants respectfully state as follows:

## INTRODUCTION

Movants are fully aware of the challenges facing the Commonwealth of Puerto Rico (the "Commonwealth") and are generally supportive of Congress's interest in addressing the Commonwealth's longstanding fiscal, management, and structural problems.  Movants intend to work with the Oversight Board in an effort to reach a solution that benefits all parties.  However, in the interim, the Commonwealth has failed to recognize the constitutional and contractual rights of Movants and other secured creditors.  Movants therefore seek limited relief within the PROMESA framework in order to protect their property interests and challenge the improper diversion of their property.

The ERS is one of three public retirement systems in Puerto Rico and it is broadly responsible for providing pension and other benefits to retired employees of the Commonwealth and its instrumentalities.  In 2008, the ERS issued pension funding bonds ("ERS Bonds"), the

---

[1] A proposed order is attached hereto as Exhibit A.

proceeds of which were used to increase funds available to pay pension benefits to retired employees of the government of the Commonwealth and its instrumentalities.  Movants are owners of those bonds.  To secure the bonds, the ERS granted Movants, through a fiscal agent, a pledge and assignment of, and the grant of a security interest and lien in and over, all future employer contributions and the ERS's right to those contributions, among other things.  No other holder of debt issued by the Commonwealth or any of its instrumentalities has a lien on this property.

On April 6, 2016, the Commonwealth enacted the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act or Act No. 21-2016 (the "Moratorium Act"), which failed to respect the constitutional and contractual rights of Movants and gave the Governor unfettered authority to declare a complete moratorium on debt payments by certain government entities, including the ERS.

On June 30, 2016, the federal government enacted PROMESA, which provides the tools necessary to institute comprehensive fiscal and economic reforms for the Commonwealth. PROMESA's enactment automatically and immediately triggered a stay on creditor remedies against the Commonwealth and its instrumentalities.  PROMESA also expressly preempted certain laws of the Commonwealth, such as the Moratorium Act.

On the same day, Governor García Padilla issued Executive Order 2016-31 ("EO-2016-31"), which declared that the ERS is in a state of emergency, and suspended the ERS's contractual obligation to transfer employer contributions to the ERS's fiscal agent for payment on its outstanding bonds. EO-2016-31 also suspended the Commonwealth's obligations to make employer contributions to the ERS up to the amount of debt service payable by the ERS during fiscal year 2016-2017.   The ERS continues to receive employer contributions from non-

Commonwealth employers, however, as EO-2016-31 does nothing to alter or suspend those employer obligations to make required contributions. All of the contributions that are currently being made are subject to the lien and security interest granted by the ERS to secure ERS Bonds.

Creditors secured by valid liens on property are entitled to adequate protection if their interests in property are diminished or impaired in any way. *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 370 (1988). Movants have valid liens and security interests on all employer contributions received by the ERS. These liens and security interests have been diminished and impaired by actions of the Commonwealth. Through the Moratorium Act and EO-2016-31, the Commonwealth has and continues to improperly divert employer contributions received by the ERS from non-Commonwealth employers away from bondholders. This diversion is not permitted under PROMESA, which prohibits the transfer of property subject to a valid lien or security interest, PROMESA § 407, nor is it permitted under the Takings and Contracts Clauses of the United States and Puerto Rico Constitutions.

The Commonwealth has made no effort to provide adequate protection and has expressly refused to do so. Prior to filing the instant motion, Movants made a written request to the Commonwealth seeking adequate protection (attached hereto as Exhibit B), but the Commonwealth denied that request (attached hereto as Exhibit C). Movants therefore seek relief from the PROMESA stay. PROMESA provides that the Court "shall" grant relief from the PROMESA stay for "cause," PROMESA § 405(e)(2), and the absence of adequate protection to compensate Movants for the impairment of their liens and security interests constitutes "cause" under PROMESA.

Accordingly, Movants respectfully request that the Court grant relief from the PROMESA automatic stay, unless adequate protection is granted in the form of placing the

employer contributions collected during the automatic stay in an account established for the benefit of Movants.

## JURISDICTION AND VENUE

This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1331, as well as Sections 106(a) and 405(e) of PROMESA. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as well as Sections 106(a) and 405(e) of PROMESA.

## BACKGROUND

### A. THE ERS AND ERS BONDS

The ERS is one of three public retirement systems in Puerto Rico. It is a trust created by the Commonwealth in 1951 to provide pension and other benefits to officers and employees of the government of the Commonwealth, members and employees of the Legislature, and officers and employees of public corporations and municipalities of the Commonwealth. P.R. Laws Ann. tit. 3, § 761 (2016). The ERS is an independent, self-governing entity that is separate from the Commonwealth and governed by an eleven-member Board of Trustees. *Id.* § 775.

The ERS is funded by employer contributions, employee contributions, and the investment earnings of the ERS. *Id.* § 780, 781 (2013). Currently, each employer must contribute a minimum of 15.525 percent of the compensation regularly received by eligible employees. *See* Act 447, § 5-106, as amended by Act No. 3 of 2013. The ERS is contractually obligated to take every measure to ensure the collection of employer contributions, and oppose any attempt by the Commonwealth to reduce employer contributions or make any other change that would have a material adverse effect on bondholders. Pension Funding Bond Resolution

§ 709(2) (January 24, 2008) ("ERS Bond Resolution") (attached hereto as Exhibit D).[2]   The Commonwealth is responsible for approximately 59 percent of employer contributions, while municipalities and public corporations are responsible for the remaining approximately 41 percent.   *See* Commonwealth of Puerto Rico, Financial Information and Operating Data Report 2014, at 161 (November 6, 2015), https://goo.gl/iiSjkz.

The ERS's Enabling Act authorized the ERS to incur debt in various forms and to secure such debt with its assets.   P.R. Laws Ann. tit. 3, § 779(d) (2011) ("The Board of Trustees [of the ERS] may authorize the Administrator [of the ERS] to seek a loan from any financial institution of the Government of the Commonwealth of Puerto Rico or the Federal Government of the United States of America or through the direct placement of debts, securing said debt with the assets of the System. . . .").[3]   Pursuant to that statutory authority, the ERS issued ERS Bonds in

---

[2] If employers fail to make employer contributions on time, or contribute less than the amount statutorily required, the ERS *must* pursue all available legal remedies to collect such contributions.   *See* ERS Bond Resolution §§ 701, 709(1), 1102.   The ERS has the statutory authority to compel the payment of unpaid employer contributions, and the failure to remit such contributions to the ERS in a timely manner may constitute a crime.   *See, e.g.*, Act No. 447, § 4-109(f), as amended by Act No. 116 of 2011 and Act No. 3 of 2013 (if the head of an agency, the mayor of a municipality, or the head of a public corporation, that is a participating employer, "knowingly [and] willfully" fails to make employer contributions after receiving notice from the ERS, he shall be charged with a felony punishable by a six-year term of imprisonment or a fine of $10,000 (to be paid from personal funds), or both); *see also* Act 32-2013, § 1(h) (amending and renumbering Act 447, § 4-109 as § 4-111 of Act 3-2013) (employer contributions payable to the ERS that have been in arrears for more than 30 days have priority over any other outstanding debt of an agency, public corporation, or other entity with participants in the ERS); Act No. 116-2011 (amending Act No. 447) (if a municipality fails to make employer contributions, the ERS is authorized to submit a certificate of debt to the Municipal Revenues Collection Center, which must immediately remit payment to the ERS on behalf of the municipality from that municipality's property taxes); *id.* (amending Act No. 447, § 4-109) (if agencies, public corporations, and instrumentalities of the Commonwealth fail to make employer contributions, the ERS is authorized to issue a certificate of debt to the Department of Treasury for immediate payment).

[3] Subsequent legislation modified the statutory authorization to incur debt effective July 6, 2011.   Currently, the ERS may not issue bonds secured by its assets without the consent of two-

2008 in order to increase the funds available to pay pension benefits to retired employees of the government of the Commonwealth and its instrumentalities, and to reduce the ERS's unfunded accrued actuarial pension liability.  *E.g.*, ERS Senior Pension Funding Bonds, Series A, at 2. The vast majority of ERS Bonds were sold to individual residents of the Commonwealth and local businesses, and many are still held by those persons and entities.  As of June 30, 2016, the face value on outstanding ERS Bonds totaled approximately $3,126,000,000.  *See* Employees' Retirement System of the Government of the Commonwealth of Puerto Rico, Basic Financial Statements and Required Supplementary Information, June 30, 2014, at 57 (June 2, 2016), https://goo.gl/uyMGmL.  Movants are holders of approximately $1,700,000,000 of ERS Bonds.

The ERS granted holders of ERS Bonds ("ERS Bondholders"), through a fiscal agent (the "Fiscal Agent"), a security interest in and lien on certain property of the ERS as security for ERS Bonds, including *all* employer contributions received by the ERS, and all "right, title, and interest of [the ERS] in and to" those contributions and "all rights to receive [those contributions]."  ERS Bond Resolution § 501 & Exh. B, VI-36.  The property subject to the liens and security interests collateralizing ERS Bonds is free and clear of any other pledge, lien, charge, or encumbrance, *id.* § 705, and is to be used to make timely principal and interest payments on ERS Bonds, *id.* §§ 501, 701.  The security interest in and lien on employer contributions and the right to those contributions is "valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the [ERS], irrespective of whether such parties have notice thereof."  *Id.* § 501.

---

(continued…)

thirds of the members of the Board (through secret vote) and an enactment of legislation by the Legislative Assembly (with the consent of two-thirds of the members).  *See* Act No. 116-2011, § 3-105 (amending Act No. 447).

The Enabling Act requires employers to transfer employer contributions to the ERS on a monthly basis, following withholding of contributions from employees. P.R. Laws Ann. tit. 3, §§ 780, 781 (2013). Once received by the ERS, the ERS Bond Resolution requires the ERS to transfer employer contributions to the Fiscal Agent on the last business day of each month. ERS Bond Resolution § 504. The Fiscal Agent must immediately (and not later than the next business day) deposit employer contributions into the "Revenue Account," except in limited circumstances not relevant here. *Id.* Monies on deposit in this account are to be deposited, in order of priority, (a) to an account to make debt service on senior bonds, (b) to a reserve account for senior bonds, (c) to an account to make debt service on subordinated bonds, (d) to a reserve account for subordinated bonds, (e) to pay operating expenses, and (f) to a general reserve account. *Id.* The Fiscal Agent is then responsible for making interest and principal payments to ERS Bondholders from these accounts when due. *Id.* § 505(4), (5).

As of August 1, 2016, the Fiscal Agent held amounts on deposit in the aggregate amount of $113,851,948.93, consisting of (a) $13,892,075.92 for debt service on senior bonds, (b) $83,259,495.30 on reserve for senior bonds, and (c) $16,700,377.71 in the general reserve account. *See* Fiscal Agent Notice to ERS Bondholders (August 5, 2016) (attached hereto as Exhibit E). These funds are subject to the lien held by ERS Bondholders.

Currently, the ERS's primary obligations consist of benefit payments and debt service payments to ERS Bondholders. Under the ERS Bond Resolution, employer contributions are to be used to pay bondholders first, with any excess allocated to pay beneficiaries. ERS Bond Resolution § 501 & Exh. B, VI-36. Employer contributions from non-Commonwealth entities are sufficient to cover debt service on ERS Bonds. For example, the ERS was projected to receive approximately $480,000,000 in employer contributions in 2016, including $197,000,000

from non-Commonwealth entities.  *See* Puerto Rico Government Employees Retirement System,

June 30, 2014 Actuarial Valuation Report (revised), at 29 (October 16, 2015); Commonwealth of

Puerto Rico, Financial Information and Operating Data Report 2014, at 161 (November 6, 2015),

https://goo.gl/iiSjkz (explaining that non-Commonwealth employers contribute approximately 41

percent of employer contributions).    Annual debt service on ERS Bonds is currently

approximately $167,000,000.  *See* Employees' Retirement System of the Government of the

Commonwealth of Puerto Rico, Basic Financial Statements and Required Supplementary

Information, June 30, 2014, at 60 (June 2, 2016), https://goo.gl/30qw0G.

### B.  THE MORATORIUM ACT

On April 6, 2016, the Commonwealth enacted the Moratorium Act, which applies

broadly to obligations of the Commonwealth and certain of its instrumentalities, including the

ERS.  Moratorium Act, Art. 103(t)(i).  It purported to give the Governor the authority to issue an

executive order declaring a complete moratorium on payments by certain government entities on

outstanding debt obligations, notwithstanding prior promises and commitments made, or liens

and security interests granted, by those entities.  *Id.* Art. 201(a) (authorizing the Governor, "by

executive order, to declare [government entities] to be in a state of emergency and identify in

such order enumerated obligations of [the entities], as applicable, and if the executive order so

provides, no payment on [those obligations] shall be made").

### C.  PROMESA

On June 30, 2016, PROMESA was enacted in direct response to the fiscal and economic

crisis facing Puerto Rico.  It was passed in the Senate and signed by President Obama a day

before Puerto Rico threatened to default on more than $1 billion in debt.  The PROMESA

Oversight Board (the "Board") is an entity within the government of the Commonwealth and is

not a department, agency, establishment, or instrumentality of the federal government. PROMESA § 101(c). Its entire membership, however, is appointed by the President and may be removed by the President for cause. PROMESA § 101(e). On August 31, 2016, President Obama appointed the Board's membership.

The Board possesses broad powers and responsibilities. For example, it may hold hearings, take testimony, receive evidence, issue subpoenas, obtain data from the federal government or the Commonwealth, enter into contracts, or enforce certain laws of the Commonwealth as necessary to carry out its duties under the Act. *Id.* § 104. The Board must also approve and certify a fiscal plan for the Commonwealth that provides a method for the Commonwealth to achieve fiscal responsibility and access to the capital markets, *id.* § 201; must approve and certify the Commonwealth's budgets, *id.* §§ 202, 203; must review any newly-enacted laws along with an estimate of the impact the law will have on revenues and expenditures, *id.* § 204(a); may require prior approval of certain contracts to be executed by the Commonwealth to ensure that they promote market competition and are not inconsistent with the approved fiscal plan, *id.* § 204(b)(2); may review certain rules and executive orders of the Commonwealth, *id.* § 204(b)(4); may submit recommendations to the Commonwealth on actions it may take to comply with the fiscal plan, *id.* § 205; must issue a restructuring certification for any entity wishing to restructure under the Act, *id.* § 206; must approve any debt issuance or similar transaction by the Commonwealth, *id.* § 207; must submit an annual report describing the Commonwealth's progress in meeting the objectives of PROMESA, *id.* § 208; may conduct an analysis of the Commonwealth's pension system, *id.* § 211; and may intervene in any litigation filed against the Commonwealth, *id.* § 212. The Board may be terminated only when the Commonwealth has adequate access to short- and long-term credit markets at reasonable rates,

has developed its budgets for four consecutive years in accordance with modified accrual accounting standards, and has achieved balanced budgets. *Id.* § 209.

PROMESA expressly preempts any law, like the Moratorium Act, that prescribes a method of composition of indebtedness or any moratorium law, if it prohibits the payment of principal and interest, and any judgment entered under such a law may not bind a nonconsenting creditor. *Id.* § 303(1)-(2). PROMESA also expressly preempts any "unlawful executive orders" of the Commonwealth, like EO-2016-31, that alter the rights of holders of any debt of a territorial instrumentality, like ERS Bonds, or divert funds from one instrumentality to another. *Id.* § 303(3).

The enactment of PROMESA automatically triggered a stay on creditor remedies against the Commonwealth and its instrumentalities, modeled on the Bankruptcy Code's automatic stay. *Id.* § 405. The stay began on June 30, 2016, and will last until February 15, 2017. *Id.* § 405(d). The Board may extend the stay during the creditor negotiation period by an additional 75 days if it determines that additional time is needed to reach a voluntary agreement, and the district court may extend the stay an additional 60 days if it makes a similar determination. *Id.*

The stay applies to the commencement or continuation of any lawsuit related to debt obligations; the enforcement of any judgment previously obtained; any action to obtain property or exercise control over property; any action to create, perfect, or enforce any lien against property related to debt obligations; any action to collect, assess, or recover a right to payment; and the setoff of any debt. *Id.* § 405(b).

PROMESA permits parties to obtain relief from the stay for "cause shown." *Id.* § 405(e)(2).

### D. EO-2016-31

On June 30, 2016, Governor García Padilla issued EO-2016-31 (attached hereto as Exhibit F) pursuant to Sections 201 and 203 of the Moratorium Act. EO-2016-31 declared the ERS "to be in a state of emergency" and announced the commencement of an emergency period for the ERS as of the date of the order. EO-2016-31 at 2. The order suspended "any obligation of [the] ERS pursuant to the [ERS Bond Resolution] to transfer contributions made by employers that participate in [the] ERS, and any assets in lieu thereof or derived thereunder paid to [the] ERS under [Act 447] to the Trustee." *Id.* at 2-3. EO-2016-31 "does not suspend payment of other obligations of ERS," however. *Id.* at 3.

EO-2016-31 also suspended the Commonwealth's obligations to "make or transfer [e]mployer [c]ontributions to [the] ERS up to the amount of debt service payable by [the] ERS during fiscal year 2016-2017." *Id.* But it does not suspend the obligations of non-Commonwealth employers—such as municipalities, instrumentalities and public corporations—to make employer contributions to the ERS on a monthly basis. *See* EO-2016-31. As a result, although the ERS continues to receive employer contributions from non-Commonwealth employers, it is diverting those funds instead of transferring them to the Fiscal Agent to be held for the benefit of Movants. In other words, the requisite flow of funds under the Enabling Act and the Bond Resolution are being disrupted by (a) a reduction of Commonwealth payments to the ERS, and (b) the diversion of employer contributions received by the ERS instead of transferring them to the Fiscal Agent for the benefit of Movants.

While EO-2016-31 diverts money away from ERS Bondholders, the order clarifies that debt service payments "can be made from funds on deposit with a trustee," *id.*, although these amounts are not replenished as required in the ERS Bond Resolution.

## ARGUMENT

PROMESA's stay provision seeks to recognize the competing interests of debtors and creditors.  It provides for an immediate stay on creditor remedies against the Commonwealth and its instrumentalities to provide the Commonwealth with time to focus its resources on negotiating voluntary resolutions instead of defending litigation.  But it also recognizes that courts must lift the stay in certain scenarios to protect creditors.  This is one such scenario.  Movants are secured creditors whose property is being diverted in violation of PROMESA, and who are entitled to (and are not receiving) constitutionally-mandated adequate protection of their property interests.  PROMESA requires the Court to lift the automatic stay under these circumstances.

### A. THE COURT SHOULD LIFT PROMESA'S STAY UNLESS MOVANTS ARE AFFORDED ADEQUATE PROTECTION

By its terms, PROMESA's stay is not absolute.  Like the Bankruptcy Code, PROMESA contemplates that courts will provide relief from the stay where appropriate.  Specifically, PROMESA states that, "[o]n motion of or action filed by a party in interest and after notice and a hearing, the United States District Court for the District of Puerto Rico, *for cause shown*, shall grant relief from the [PROMESA] stay."  PROMESA § 405(e)(2) (emphasis added).  Movants easily satisfy PROMESA's "cause" requirement.  The Commonwealth has not provided adequate protection of Movants' property interests and the failure to do so necessarily constitutes "cause."

1. "Cause" in PROMESA's stay provision carries a substantially identical meaning to "cause" in the Bankruptcy Code.

PROMESA's stay provision is modeled on the automatic stay found in § 362 of the Bankruptcy Code.  Congress enacted § 362 to codify preexisting law that a secured creditor is constitutionally entitled to adequate protection to safeguard its property rights.  *See infra* Part

A.3.  Like the PROMESA stay provision, § 362 of the Bankruptcy Code states that a court "shall" grant relief from the stay to a party in interest "for cause."  11 U.S.C. § 362(d).  The Court should therefore look to the Bankruptcy Code and interpretive case law construing § 362 to give meaning to the term "cause" as it is used in PROMESA.[4]

Section 362 of the Bankruptcy Code specifically lists "the lack of adequate protection" as one ground for finding "cause" to lift the automatic stay.  Section 362(d)(1) states that "the court shall grant relief from the stay . . . for cause, *including* the lack of adequate protection of an interest in property of such party in interest."  *Id.* (emphasis added).  A plain reading of this provision leaves absolutely no doubt that a lack of adequate protection of an interest in property—and there is no doubt that a lien and security interest is an interest in property— constitutes "cause" such that a court is required to grant relief from the automatic stay.[5]

The same is true under PROMESA's automatic stay provision.  Congress legislated on the premise that "cause" to lift the automatic stay includes the lack of adequate protection under

---

[4] In related litigation before this Court, the Commonwealth effectively conceded that courts should look to the automatic stay provision of the Bankruptcy Code when interpreting PROMESA's stay provision.  *See* Commonwealth's Mot. for Recons., *Lex Claims, LLC, et al v. Alejandro Garcia Padilla, et al.*, No. 16-cv-2374, Dkt. 34, at 3 (Sept. 7, 2016) ("The stay provisions contained in § 405(b) of PROMESA were modelled after the stay provisions in § 362 of the Bankruptcy Code, 11 U.S.C. § 362.").

[5] Although "cause" expressly includes the lack of adequate protection, it is by no means limited to that scenario.  11 U.S.C. § 102(3) (explaining the words "'includes' and 'including' are not limiting").  Courts consider what constitutes cause based on "the totality of the circumstances in each particular case."  *In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997).  "The concept of 'cause' is broad and flexible requiring a fact intensive analysis."  *Buncher Co. v. Flabeg Solar US Corp.* (*In re Flabeg Solar US Corp.*), 499 B.R. 475, 482-83 (Bankr. W.D. Pa. 2013).  Courts generally consider "the interests of the debtor, creditors, and parties in interest as well as the underlying policies of the Bankruptcy Code."  *Id.* at 483.  The Court need not conduct this analysis here, as the lack of adequate protection is expressly specified as a basis for finding "cause."

§ 362 of the Bankruptcy Code, and there is every reason to think Congress intended a substantially identical meaning when it used the same term in PROMESA.

     2.  <u>Leaving the PROMESA stay in place in the absence of adequate protection renders PROMESA unconstitutional.</u>

A lack of adequate protection constitutes "cause" to lift the automatic stay because adequate protection is derived from the Fifth Amendment's protection of property interests. *See Wright v. Union Cent. Life Ins. Co.*, 311 U.S. 273 (1940); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935).[6] The concept of adequate protection predates the modern Bankruptcy Code, and the requirement that a secured creditor receive adequate protection was added to the Bankruptcy Code for both constitutional and policy reasons. *See* House Report No.

_____

[6] This is well-settled and uncontroverted. Bankruptcy and other courts have long acknowledged that the concept of adequate protection is grounded in the Fifth Amendment. *See, e.g.*, *Pa. State Emps. Ret. Fund v. Roane*, 14 B.R. 542, 544, No. 81-1319, 1981 U.S. Dist. LEXIS 14834, at *6 (E.D. Pa. Sep. 11, 1981) ("[T]he purpose of 'adequate protection' is to protect the property interests of secured creditors pursuant to the Fifth Amendment prohibition against takings without just compensation. Therefore, not only is the concept of 'adequate protection' important under the statute, but it is mandated by the Fifth Amendment.") (citation omitted); *In re Aegean Fare, Inc.*, 33 B.R. 745, 747, No. 83-01377-L, 1983 Bankr. LEXIS 5237, *5 (Bankr. D. Mass. 1983) ("Adequate protection is derived from the fifth amendment protection of property interests."); *In re Sweetwater*, 40 B.R. 733, 745 (Bankr. D. Utah 1984) ("The origin of the adequate protection concept shows that it was intended to protect the constitutional rights of secured creditors in their collateral under the fifth amendment's taking and due process clauses, and to enable them to receive the benefit of their bargain."); *In re Lipply*, 56 B.R. 524, 526 (Bankr. N.D. Ind. 1986) ("Adequate protection is a cornerstone of the bankruptcy process. The concept is derived from the fifth amendment protection of property interests."); *In re Planned Sys., Inc.*, 78 B.R. 852, 861 (Bankr. S.D. Ohio 1987) ("The concept of adequate protection is derived from the fifth amendment protection of property interests."); *In re DeSardi*, 340 B.R. 790, 797 (Bankr. S.D. Tex. 2006) ("The concept of adequate protection finds its basis in the Fifth Amendment's protection of property interests"); *In re Dispirito*, 371 B.R. 695, 698 (Bankr. D.N.J. 2007) ("The concept of adequate protection finds its basis in the Fifth Amendment's protection of property interests."); *In re Young*, No. 7-11-12554, 2011 Bankr. LEXIS 3300, at *19 (Bankr. D.N.M. Aug. 29, 2011) ("The concept of adequate protection is derived from the property interest protections found in the Fifth Amendment's prohibition against taking private property without just compensation."); *Graham v. Huntington Nat'l Bank* (*In re MedCorp, Inc.*), 472 B.R. 444, 452 (Bankr. N.D. Ohio 2012) ("The concept of adequate protection is founded on the Fifth Amendment to the United States Constitution, and its protection of private property interests.").

95-595, 95th Cong. 1st Sess., 338-40 (1977), Senate Report No. 95-989, 95th Cong., 2d Sess., 49, 53-54 (1978) ("adequate protection is based as much on policy grounds as on constitutional grounds").

As a constitutional imperative, adequate protection is a safeguard that protects the property rights of a secured creditor.  "By providing a creditor with a means of protecting its interest through [the] adequate protection requirement, the competing interests of the debtor's need to reorganize and the secured creditor's entitlement to constitutional protection of its bargained-for property interests are reconciled."  *In re Briggs Transp. Co.*, 780 F.2d 1339, 1342 (8th Cir. 1985).  Adequate protection thus ensures there is no "taking" of a creditor's property in contravention of the Fifth Amendment.

The adequate protection requirement is also grounded in the policy belief that secured creditors should not be deprived of the benefit of their bargain.  A "secured creditor's right to take possession of and sell collateral on the debtor's default has substantial, measurable value. The secured creditor bargains for this right when it agrees to extend credit to the debtor and both parties consider the right part of the creditor's bargain."  *In re Am. Mariner Indus.*, 734 F.2d 426, 435 (9th Cir. 1984).  The legislative history of the Bankruptcy Reform Act of 1978 explains:

> There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the bankruptcy law.  Thus, this section recognizes the availability of alternate means of protecting a secured creditor's interest.  Though the creditor may not receive his bargain in kind, the purpose of the section is to insure that the secured creditor receives in value essentially what he bargained for.

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 339 (1977).  Without adequate protection, a debtor can prevent a secured creditor "from enforcing its rights against collateral while the debtor benefits from the creditor's money [and] the debtor and his unsecured creditors receive a windfall at the expense of the secured creditor."  *In re Am. Mariner Indus.*, 734 F.2d at 435.

Consistent with this long history, PROMESA's stay provision protects the constitutional rights of secured creditors in their collateral under the Fifth Amendment, and enables them to receive the benefit of their bargain.  Indeed, leaving the PROMESA stay in place in the absence of adequate protection of Movants' property would render PROMESA unconstitutional. Because "[t]he concept of adequate protection is derived from the fifth amendment protection of property interests as enunciated by the Supreme Court," S. Rep. No. 95-989, at 49 (1978), it follows that a failure to lift PROMESA's automatic stay despite a lack of adequate protection would render PROMESA unconstitutional as a taking without just compensation.

PROMESA's automatic stay unquestionably deprives Movants of their constitutionally-protected property interests, as it prohibits them from realizing the value of their lien on employer contributions.  Movants have neither consented to the deprivation of their property nor received just compensation for that deprivation.  Adequate protection is thus necessary to protect Movants against diminution in the value of their property interests and remedy the constitutional concerns.  In the absence of adequate protection, PROMESA will result in an unconstitutional taking of Movants' interest in such property without just compensation.

3.   The Bankruptcy Act of 1898 provides no guidance on the PROMESA stay provision.

In related litigation before this Court, the Commonwealth has incorrectly argued that courts should interpret the term "cause" in PROMESA in accordance with the Bankruptcy Act of 1898 and impose an allegedly higher standard of requiring creditors to show "irreparable harm" before a court could lift the automatic stay.  *See, e.g.*, Commonwealth's Opp., *Peaje Investments LLC. v. Alejandro Garcia Padilla, et al.*, No. 16-cv-02365, Dkt. 30, at 6-7 (Aug. 4, 2016); Commonwealth's Opp., *Assured Guarantee Corp., et al v. Commonwealth of Puerto Rico, et al.*, No. 16-cv-02384, Dkt. 22, at 14-15 (Aug. 17, 2016).  This argument stands in conflict with the

Commonwealth's position in another case before this Court that "[t]he stay provisions contained in § 405(b) of PROMESA were modelled after the stay provisions in § 362 of the Bankruptcy Code, 11 U.S.C. § 362." *See supra* n.4. In any event, the Commonwealth's argument is both nonsensical and legally unsound.

*First*, the Bankruptcy Act of 1898 was repealed almost 40 years ago, and the Commonwealth offers no explanation why Congress, in enacting PROMESA, would borrow from that statute instead of the current Bankruptcy Code—if, in fact, the two statutes differed in the meaning of the relevant language. The Commonwealth also offers no other examples of Congress borrowing from the repealed 1898 Bankruptcy Act in PROMESA.

*Second*, the Commonwealth ignores the irrefutable fact that the lack of adequate protection was consistently recognized as "cause" for lifting the automatic stay even under the 1898 Bankruptcy Act because of its constitutional underpinnings. Indeed, the 1978 Bankruptcy Code, which added the existing adequate protection provision in § 362, was largely a codification of existing law in this regard:

> The rules Congress set forth in § 361 and § 362 regarding the automatic stay and the circumstances under which it might be lifted were not particularly innovative. . . .[C]reditors interests were not ignored before a lack of adequate protection was expressly codified as a reason for lifting the stay: "Case law had made adequate protection of the secured creditor a major consideration long before the draft predecessor of the Code proposed to codify it as a requirement."

*In re Timbers of Inwood Forest Assocs., Ltd.*, 793 F.2d 1380, 1390 (5th Cir. 1986) (quoting Webster, *Collateral Control Decisions in Chapter Cases: Clear Rules vs. Judicial Discretion*, 51 Am. Bankr. L.J. 197, 237 (1977)).

*Third*, the Commonwealth's claim that the 1898 Bankruptcy Act imposed a higher standard than the current Bankruptcy Code and required creditors to show "irreparable harm" to lift the automatic stay is grossly misleading. A showing of "irreparable harm" sufficient to lift

the stay under the 1898 Act was the equivalent of a lack of adequate protection.  Courts defined

irreparable harm as follows:

> That the value of the creditor's security decreased or is decreasing below that value existing at the filing of the Chapter XII petition; and if the value has decreased or is decreasing since the filing of the Chapter XII petition, is there protection available in the proceeding which will adequately protect such existing value.

*In re Oakdale Assocs.*, No. 78 B 2461, 1979 Bankr. LEXIS 726, at *15-16 (Bankr. E.D.N.Y.

Nov. 28, 1979); *see also In re The Overmyer Company, Inc.*, 2 BCD 992 (S.D.N.Y. 1976)

("Swiftly and surely, the spontaneous yield of the words casts upon the secured party seeking

relief from the Rule 11-44(a) stay [of the 1898 Bankruptcy Act] the burden to show cause why

continuance of the stay would cause irreparable damage which, in the context of this dispute,

should be read to mean *an erosion of the value of the security in respect of the outstanding*

*obligation*." (emphasis added)).  The Commonwealth's claim that the 1898 Act required a more

robust showing to lift the automatic stay is therefore patently incorrect—the failure to provide

adequate protection is sufficient grounds to lift the stay under either the 1898 Act or the current

Bankruptcy Code.

## B. THE COMMONWEALTH HAS IMPROPERLY REFUSED TO PROVIDE ADEQUATE PROTECTION OF MOVANTS' CONSTITUTIONALLY-PROTECTED AND BARGAINED-FOR INTERESTS IN PROPERTY

A secured creditor is entitled to adequate protection in the form of the economic

equivalent of the benefit of its bargain.  In describing the meaning of the term for purposes of a

plan's confirmation under the Bankruptcy Act of 1898, Judge Learned Hand explained:

> In construing so vague a grant, we are to remember not only the underlying purposes of the section, but the constitutional limitations to which it must conform. It is plain that 'adequate protection' must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his

money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence.

*In re Murel Holding Corp.*, 75 F.2d 941, 942 (2d Cir. 1935).

Respondents cannot dispute that Movants lack adequate protection of their constitutionally-protected property interests in employer contributions received by the ERS, and all right, title, and interest of the ERS to those contributions.   Respondents have nonetheless made no effort to provide adequate protection—adequate protection "of the most indubitable equivalence," *id.*; *see also In re Bldrs. Grp. & Dev. Corp.*, 502 B.R. 95, 122 (Bankr. D.P.R. 2013) (any decrease in collateral value "attributable to the debtor's usage" of rents pledged as collateral "must be protected by cash payments from another source, an additional or replacement lien, or other such indubitable equivalent")—and has expressly refused to do so.   Prior to filing the instant motion, Movants made a written request to the Commonwealth seeking adequate protection (Exhibit B), but the Commonwealth denied that request (Exhibit C).   Since June 30, 2016, when Governor García Padilla issued EO-2016-31, Respondents have been improperly diverting the property of Movants.   EO-2016-31 ordered the ERS to stop transferring employer contributions to the respective reserve accounts to be held for the benefit of Movants—as the ERS Bond Resolution unmistakably requires the ERS to do—even as the ERS continues to receive contributions from non-Commonwealth employers, such as municipalities, instrumentalities and public corporations.[7]

Without adequate protection, Movants face certain decline in the value of their lien as Respondents continue to improperly divert employer contributions received from non-

---

[7] EO-2016-31 suspended only the Commonwealth's obligations to "make or transfer [e]mployer [c]ontributions to [the] ERS up to the amount of debt service payable by [the] ERS during fiscal year 2016-2017."   EO-2016-31 at 3.

Commonwealth employers.  In other litigation before this Court, the Commonwealth has asserted three reasons why secured creditors are not harmed during the PROMESA automatic stay.  None of these arguments has any merit.

*First*, the Commonwealth has incorrectly argued that secured creditors like Movants do not face a decline in the value of their revenue stream during the automatic stay because of expected future revenues.  This argument ignores the unique nature of Movants' property: Any use of employer contributions "results in a dollar-for-dollar reduction in the value of that collateral."  *In re Putnal*, 483 B.R. 799, 805 (Bankr. M.D. Ga. 2012); *see also In re Jefferson Cty.*, 474 B.R. 228, 272 (Bankr. N.D. Ala. 2012) (explaining that a lien on revenues cannot be adequately protected from the debtor's use of such revenues by the existence of a lien on future revenues where the lenders are already entitled to such future revenues); *see also Builders Group*, 502 B.R. at 122 (holding "a diversion of any portion of the rents to a party other than the secured party is clearly a diminution of the secured party's interest in the assignment of rents portion of the security").  Additionally, if the Commonwealth continues to improperly divert employer contributions pledged to repay Movants, there is a significant possibility that Movants will be unable to realize the value of their collateral at a later date.  "Once cash collateral has been dissipated and spent, court-fashioned sanctions such as retroactive adequate protection . . . can be hollow victories for a secured creditor and do not rise to the level of a 'remedy.'"  *See In re Williams*, 61 B.R. 567, 575 (Bankr. N.D. Tex. 1986).

*Second*, the Commonwealth has argued that secured creditors like Movants are not harmed where there is sufficient cash in reserve accounts to make interest payments for the duration of the automatic stay.  This is entirely beside the point.  A secured creditor is constitutionally entitled to adequate protection when the automatic stay "results in a decrease in

the value of such entity's interest in . . . property." *Timbers of Inwood Forest*, 484 U.S. at 370. Here, Respondents' continued diversion of Movants' cash property undoubtedly results in a decrease in the value of Movants' lien. Quite simply, the Commonwealth's argument ignores the stark reality that, in these circumstances, Movants are being stripped of their collateral.

*Third*, the Commonwealth has argued that PROMESA's creditor protection provisions obviate the need to provide adequate protection. Specifically, § 407 of PROMESA permits a creditor to file suit if any property of an instrumentality that is subject to a security interest or lien is transferred in violation of applicable law. PROMESA § 407. In such a scenario, the transferee is liable for the value of that property. *Id.* But § 407 of PROMESA is not a substitute for adequate protection. To the contrary, courts have made clear that "a lawsuit is too speculative in nature to offer adequate protection" to creditors. *Rocco v. J.P. Morgan Chase Bank*, 255 F. App'x 638, 641 (3d Cir. 2007); *see also In re Kenny Kar Leasing, Inc.*, 5 B.R. 304, 309 (Bankr. C.D. Cal. 1980) ("The use of [the secured creditor's] cash collateral . . . expose[s] [the creditor] to a decrease in the value of its interests and a present risk of impairment of its ability to realize on the value of its collateral package. To compel a secured creditor to accept such risks on the basis of rights to pursue a [lawsuit against a] guarantor, is to shift the hazards and the cost of the rehabilitation effort from the debtor to the secured creditor. Such a proposition is not within the contours of the concept of adequate protection embodied in the [Bankruptcy] Code."); *In re Turner*, 326 B.R. 563, 577-78 (Bankr. W.D. Pa. 2005) ("[L]itigation is highly speculative. It is uncertain when and at what pace the litigation will proceed and what the outcome will be.").

Moreover, the Commonwealth's argument ignores the practical uncertainties surrounding potential litigation to recover Movants' property. For example, the transferees of Movants'

property are unknown to Movants, so Movants may be unable to identify the persons or entities they must sue to recover their property. And even a successful lawsuit could leave Movants without a remedy, as the creditworthiness of those persons or entities is unknown and they may be unable to compensate Movants for the value of the property transferred.

In any event, as a matter of law, a lawsuit is never adequate protection. *See, e.g.*, *In re C.F. Simonin's Sons, Inc.*, 28 B.R. 707, 712 (Bankr. E.D.N.C. 1983) ("Even if there was indisputable evidence of the creditworthiness of the guarantors, the chance to pursue a guarantor with its uncertainties and costs is not adequate protection."). Simply put, creditors are constitutionally entitled to adequate protection "of the most indubitable equivalence," *In re Murel Holding Corporation*, 75 F.2d at 942, and a lawsuit under § 407 does not provide that.

*** 

Congress enacted PROMESA to provide the Commonwealth with tools to restructure its debts in an orderly and fair manner. Movants support this goal. But Congress did not (and could not) give the Commonwealth free rein to divert bondholder property in contravention of PROMESA itself and long-established constitutional requirements. The Commonwealth's insistence that Movants are not entitled to adequate protection, even as it continues to improperly divert Movants' property, is unprecedented and extremely dangerous. Movants respectfully submit that PROMESA should not be interpreted in a manner that renders it unconstitutional and forces ERS Bondholders to initiate additional litigation to protect their property interests.

## CONCLUSION

**WHEREFORE**, based on the above and foregoing, Movants respectfully request that the Court enter an order (a) granting Movants relief from the PROMESA automatic stay unless adequate protection is granted in the form of placing the employer contributions collected during

the automatic stay in an account established for the benefit of Movants, and (b) granting Movants

such other and further relief as the Court may deem proper.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, today September 21, 2016.

By:

/s/ *Alfredo Fernández-Martínez*
Alfredo Fernández-Martínez
DELGADO & FERNÁNDEZ, LLC
1001 San Roberto Street
Monacillos Ward
San Juan, Puerto Rico
(787) 274-1414
afernandez@delgadofernandez.com

*Counsel for Movants Altair Global Credit*
*Opportunities Fund (A), LLC, Claren Road*
*Credit Master Fund, Ltd., Claren Road Credit*
*Opportunities Master Fund, Ltd., Glendon*
*Opportunities Fund, L.P., Nokota Capital*
*Master Fund, L.P., Oaktree-Forrest Multi-*
*Strategy, LLC (Series B), Oaktree Opportunities*
*Fund IX, L.P., Oaktree Opportunities Fund IX*
*(Parallel 2), L.P., Oaktree Value Opportunities*
*Fund, L.P., Ocher Rose, L.L.C., and SV Credit,*
*L.P.*

/s/ *Bruce Bennett*
Bruce Bennett (*pro hac vice*)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
(213) 489-3939
bbennett@jonesday.com

Benjamin Rosenblum (*pro hac vice*)
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326-3939
brosenblum@jonesday.com

Beth Heifetz (*pro hac vice*)
Sparkle L. Sooknanan (*pro hac vice*)
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC  20001
(202) 879-3939
bheifetz@jonesday.com
ssooknanan@jonesday.com

*Counsel for Movants Altair Global Credit*
*Opportunities Fund (A), LLC, Claren*
*Road Credit Master Fund, Ltd., Claren*
*Road Credit Opportunities Master Fund,*
*Ltd., Glendon Opportunities Fund, L.P.,*
*Nokota Capital Master Fund, L.P.,*
*Oaktree-Forrest Multi-Strategy, LLC*
*(Series B), Oaktree Opportunities Fund*
*IX, L.P., Oaktree Opportunities Fund IX*
*(Parallel 2), L.P., Oaktree Value*
*Opportunities Fund, L.P., Ocher Rose,*
*L.L.C., and SV Credit, L.P.*

/s/ *Arturo Díaz-Angueira*

Arturo Díaz-Angueira
José C. Sánchez-Castro
Alicia I. Lavergne-Ramírez
Maraliz Vázquez-Marrero
LOPEZ SANCHEZ & PIRILLO
270 Muñoz Rivera Avenue, Suite 504
San Juan, PR 00918
(787) 522-6776
adiaz@lsplawpr.com
jsanchez@lsplawpr.com
alavergne@lsplawpr.com
mvazquez@lsplawpr.com

*Counsel for Movants Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Target Maturity Fund, Inc., Puerto Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc., Puerto Rico Investors Bond Fund I, Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico Investors Tax-Free Fund II, Inc., Puerto Rico Investors Tax-Free Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V, Inc., Puerto Rico Investors Tax-Free Fund VI, Inc., Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc., Tax-Free Puerto Rico Fund, Inc., Tax-Free Puerto Rico Fund II, Inc., Tax-Free Puerto Rico Target Maturity Fund, Inc., and UBS IRA Select Growth & Income Puerto Rico Fund*

/s/ *Glenn M. Kurtz*

Glenn M. Kurtz (pro hac vice)
John K. Cunningham (pro hac vice)
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 819-8200
gkurtz@whitecase.com
jcunningham@whitecase.com

*Counsel for Movants Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Target Maturity Fund, Inc., Puerto Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc., Puerto Rico Investors Bond Fund I, Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico Investors Tax-Free Fund II, Inc., Puerto Rico Investors Tax-Free Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V, Inc., Puerto Rico Investors Tax-Free Fund VI, Inc., Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc., Tax-Free Puerto Rico Fund, Inc., Tax-Free Puerto Rico Fund II, Inc., Tax-Free Puerto Rico Target Maturity Fund, Inc., and UBS IRA Select Growth & Income Puerto Rico Fund*